IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | | |
|---|---|---|
| ANDREA MANRIQUE YARURO, | § | |
| Plaintiff, | § | NO. 7:22-cv-00039-WLS |
| v. | § | |
| | § | |
| UNITED STATES OF AMERICA, U.S. | § | |
| IMMIGRATION AND CUSTOMS | § | |
| ENFORCEMENT, LASALLE SOUTHEAST | § | |
| LLC, DAVID PAULK, HOWARD, | § | |
| McMAHAN, AMBER HUGHES, | § | |
| "FNU" BATTLE; UNNAMED ICDC | § | |
| OFFICERS ##1-5, "FNU" WATSON, | § | |
| "FNU" CHAPPELLE, | § | |
| Defendants. | § | |

**LASALLE SOUTHEAST, LLC'S REPLY IN SUPPORT OF
<u>RULE 12(b)(6) MOTION TO DISMISS</u>**

## I.    INTRODUCTION

Plaintiff's Complaint alleges that LaSalle discriminated against Plaintiff by failing to provide reasonable accommodations for the Plaintiff's alleged disability in violation of the federal Rehabilitation Act ("RA"). But Plaintiff's RA claim against LaSalle should be dismissed for a number of reasons. First, as an initial matter, Plaintiff has not alleged that LaSalle is a recipient of "federal financial assistance" in a manner that is consistent with the requirements of the RA. Additionally, Plaintiff has failed to establish that she suffered any discrimination by exclusion from any benefits by LaSalle or that LaSalle was deliberately indifferent to her rights. Accordingly, on the substantive issues, Plaintiff's claim should be dismissed. Further, Plaintiff's RA claim should be dismissed because this Court, in its discretion, should determine that Plaintiff failed to comply with the remedies available to her within ICDC's grievance procedures. For the reasons stated more fully below, Plaintiff's RA claim against LaSalle should be dismissed.

## II.    ARGUMENT

**A.    Plaintiff has not stated a claim under Section 504 of the Rehabilitation Act.**

1. <u>Plaintiff fails to state a claim against LaSalle under the RA because the Complaint does not allege that LaSalle received federal subsidies.</u>

Because Plaintiff has only claimed exclusion from basic prison services provided by LaSalle via contract, she cannot claim that she was denied any benefit for which LaSalle would have received "federal financial assistance," within the meaning of the RA. In an RA claim where the Defendant is a private contractor, the Plaintiff must allege that the defendant is a recipient of "federal financial assistance" under the terms of the RA. *Goodman v. The Robert A. Deyton Det. Facility*, No. 1:15-CV-1724-TWT, 2015 WL 5480046, at *5 (N.D. Ga. Sept. 15, 2015) (dismissing RA claims against private prison facility and management corporation, finding compensation from contract for services is not "federal assistance"). The Eleventh Circuit has consistently held the term "federal financial assistance" in the context of the RA to mean "the federal government's provision of a subsidy to an entity," as opposed to the provision of compensation for services rendered. *McMullen v. Wakulla Cnty. Bd. of Cnty. Commissioners*, 650 F. App'x 703, 707–08 (11th Cir. 2016) *quoting Shotz v. Am. Airlines, Inc.*, 420 F. 3d 1332, 1335 (11th Cir. 2005).[1] Thus, not all federal monies qualify as "federal financial assistance"; applicability of the RA requires a determination of whether federal funds were intended as a subsidy, or as compensation. *Id*.

Here, the Complaint contains only a conclusory allegation that LaSalle receives "federal financial assistance" but does not allege that LaSalle received any *subsidy*.[2] Rather, the Complaint states that LaSalle renders services as a result of contractual relationships with ICE. Thus, the "assistance" contemplated here is necessarily compensation. First, the Complaint acknowledges

---

[1] *See also Lee v. Corrections Corp. of Am.*, 61 F. Supp. 3d 139, 144 (D.D.C. 2014); *Abdus–Sabur v. Hope Village, Inc.*, 221 F. Supp. 3d 3, 9, 2016 WL 7408833, at *4 (D.D.C. Dec. 22, 2016); *Jacobson v. Delta Airlines, Inc.*, 742 F.2d 1202, 1210 (9th Cir. 1984); *DeVargas v. Mason & Hanger–Silas Mason Co.*, 911 F.2d 1377, 1382 (10th Cir. 1990); *Jarno v. Lewis*, 256 F. Supp. 2d 499, 504–05 (E.D. Va. 2003).

[2] The Complaint provides only that: "The Rehabilitation Act applies to the services, programs, and activities within ICDC where Defendant ICE detained Mr. Jones [sic] and therefore applied to both ICE as an agency and LaSalle as a recipient of federal financial assistance." [Doc. 1 ¶ 112].

the contractual relationship between LaSalle, ICDC, and ICE, and admits the existence of a service contract.[3] Next, the Complaint acknowledges that services provided by ICDC include basic living conditions.[4] The Complaint additionally provides that ICDC's operations include providing disability accommodations and care and treatment of detainees with disabilities.[5] Finally, the Complaint notes that operations of facilities encompass clinical health care services generally.[6] Thus, the operations undertaken by LaSalle for the foregoing categories of services were the product of a contractual agreement, not a federal subsidy.

Moreover, Plaintiff's Response confirms that its generalized statement that LaSalle is a recipient of federal financial assistance is erroneous. In arguing that LaSalle failed to provide Plaintiff certain benefits, Plaintiff argues that pursuant to its Intergovernmental Service Agreement with ICE, LaSalle was required to follow the PBNDS, which requires the provision of housing, medical care, and accommodations for disabilities. [Doc. 11 at 7]. Necessarily, then, Plaintiff's Response confirms that its assertion that LaSalle is a "recipient of federal financial assistance" is based on a contract for these services, not on any subsidy.[7]

Accordingly, the specific factual allegations of the Complaint, in conjunction with Plaintiff's Response to the instant Motion, negate Plaintiff's conclusory allegation that the RA

---

[3] "Defendant LaSalle operates ICDC at ICE's behest through a pass-through contract with Irwin county, Georgia." [Doc. 1 ¶ 17] and "ICE's 2008 PBNDA applies to ICDC pursuant to an intergovernmental **service agreement** between ICE and its contractors. Here, ICE contracted with ICDC, which subcontracts with LaSalle to run the facility." [Doc. 1 ¶ 62].

[4] "A facility must provide 'basic living conditions'. . ." [Doc. 1 ¶ 67].

[5] "ICE's Disability Access Coordinators are responsible for working with ICE staff and detention facilities to review all denials of disability accommodation, while ICE Supporting Disability Access Coordinators at each ICE Field Office are responsible for . . . 'collaborating and communicating with . . . detention facility personnel. . .to monitor the care and treatment of detainees with disabilities.'" [Doc. 1 ¶ 73].

[6] As noted by the Complaint, "ICE Field Medical Coordinators ("FMCs") and the ICE Health Services Corps ("IHSC") oversee and supervise direct clinical healthcare services at ICE contract facilities like ICDC."

[7] *See, e.g., Ndiaye v. United States*, No. 4:20-CV-01703, 2021 WL 4441607 at *4 (N.D. Ohio Sept. 28, 2021). In *NDiaye*, concerning an ICE detainee's RA violation claims against a private prison management company, the court relied on allegations in the complaint similar to those alleged here to determine that the "assistance" alleged was compensatory, and that the RA claim was subject to dismissal because the claim failed as a matter of law.

"applies" to LaSalle as a "recipient of federal financial assistance." As a result, Plaintiff has not alleged that LaSalle has received "federal financial assistance," as is required to state a claim under the RA. On this basis, Plaintiff's RA claim against LaSalle should be dismissed.

> 2. <u>The factual allegations of the Complaint and reasonable conclusions drawn therefrom do not demonstrate that ICDC denied Plaintiff access to any benefit.</u>

As an initial matter, the allegations of the Complaint demonstrate that Plaintiff was provided access to the services that she requested. Moreover, to the extent that Plaintiff was deprived of any benefit or service, the Complaint admits that ICE, not ICDC denied such services. In order to avoid dismissal of an RA claim, a plaintiff must "allege facts supporting a finding that [the Defendant] excluded [her] from participation in prison services, denied [her] the benefits of prison services, or otherwise discriminated against her based on [her disability]." *Siskos v. Sec'y, Dep't of Corr.*, 817 F. App'x 760, 765 (11th Cir. 2020).[8] There is no claim under the RA where a plaintiff requests the use of medical services and the plaintiff does not allege discrimination and exclusion from those services based on a disability. *Owens v. Sec'y, Fla. Dep't of Corr.*, 602 F. App'x 475, 479 (11th Cir. 2015). Indeed, "applicable authority distinguishes a failure to treat a disability, which does not violate the ADA or RA, from a refusal to reasonably modify or accommodate a disability, which constitutes disability discrimination." *Dudley v. Singleton*, 508 F. Supp. 3d 1118, 1143 (N.D. Ala. 2020).

Plaintiff's only argument that the RA applies here is based on the nature of her requests as requests for accommodations versus disagreements with medical treatment. To that end, "the defendant's duty to provide a reasonable accommodation is not triggered until the plaintiff makes

---

[8] Footnote 3 of Plaintiff's Response erroneously concludes that *Siskos* only discusses the existence of a reasonable accommodation and does not require sufficient factual pleadings. Specifically, the *Siskos* Court found that the plaintiff failed to state a viable claim under the ADA/RA based on a failure to allege facts supporting exclusion and discrimination based on disability. *Siskos v. Sec'y, Dep't of Corr.*, 817 F. App'x 760, 765 (11th Cir. 2020).

4

a 'specific demand' for an accommodation." *Dudley v. Singleton*, 508 F. Supp. 3d 1118, 1144–45 (N.D. Ala. 2020). In that vein, the allegations of the Complaint confirm that once a request for accommodation was made, Plaintiff was evaluated by ICDC for the accommodation and the accommodation was ordered.[9] While Plaintiff argues that she never received accommodations that were ordered for her, the documents attached to her own Response confirm otherwise in regard to the back brace, which Plaintiff received at the latest, by October 6, 2020.[10]

Further, the Complaint alleges that to the extent treatment was delayed or denied, ICE, not ICDC, prevented her access to such treatment. First, the Complaint alleges that "ICE retains ultimate authority to approve or deny all off-site non-emergency health care requests." [Doc. 1 ¶ 77](internal citations omitted). The Complaint also states that ICE is responsible for reviewing all denials of disability accommodation, monitoring the care and treatment of detainees with disabilities, and managing pay authorizations for all ICE detention facilities. [Doc. 1 ¶ ¶ 73-75]. Plaintiff also claims that Officer White, an ICE agent, denied her treatment—not any official of ICDC.[11] In sum, while the Complaint acknowledges that ICDC took numerous actions to evaluate

---

[9] Plaintiff did not make a specific demand for any accommodation until July 30, 2020, at the earliest, when she requested to see a specialist. [Doc. 1 ¶ 52]. The Complaint confirms, that following diagnostic testing in August 2020, Plaintiff was referred to see a specialist in October 2020. [Doc. 1 ¶ 52]. The Complaint additionally acknowledges that Plaintiff did not request a thicker mattress until mid-August, 2020, and Plaintiff confirms that Nurse Hughes did not outright deny her access to such treatment because of her disability, but evaluated Plaintiff and concluded that Plaintiff did not meet the requisite criteria. [Doc. 1 ¶ 50]. Yet, the Complaint admits that Plaintiff was reevaluated for a thicker mattress on September 2, 2020, likely following diagnostic testing in August 2020, and a thicker mattress was ordered. [Doc. 1 ¶ 51]. Also, in September 2020, ICDC additionally ordered a back brace and a foam wedge for Plaintiff. [Doc. 1 ¶ 51].

[10] Handwriting at the top of the October 6, 2020 Provider Progress Notes states ". . . She reports that at night pain worsens with radiating down left leg. Back brace helps but very little. . ." [Doc. 11, Ex. 1 at 10].

[11] The Complaint states:
When the ICDC guards observed Ms. Manrique Yaruro screaming in pain, they would tell her that they were sorry, but that she needed to talk to ICE about receiving treatment. . . Defendant White and other ICE officers saw Ms. Manrique Yaruro limping and struggling to walk. When Ms. Manrique Yaruro complained about her back pain and her lack of medication, therapy, and other disability accommodations to Defendant White, he would usually say that he was waiting to hear back from ICE about her situation. . . **Eventually, Defendant White told Ms. Manrique Yaruro that ICE would not provide her the treatments she requested.** Even after a magnetic resonance imaging scan showed damage to her spinal discs and she asked for treatment for the injury in August of 2020, Defendant White responded "we don't do that here." Instead, he tried to flirt with her and told her that she smelled nice. [Doc. 1 ¶ ¶ 54-56] (emphasis added).

5

and treat her pain, the Complaint points to ICE as the entity preventing any further treatment. To the extent that Plaintiff alleges failure to provide reasonable accommodations as opposed to claiming that ICDC's medical decisions were somehow improper, the Complaint confirms that any denial was the result of action taken by ICE, not ICDC.

> 3. <u>Plaintiff has not alleged that LaSalle intentionally discriminated against her or that it was deliberately indifferent to her statutory rights.</u>

Plaintiff's Response does little, if anything, to provide this Court with the "deliberate indifference" required to state a claim under the RA. To allege compensatory damages under the RA, a plaintiff must show that the defendant was intentionally discriminatory or was "deliberately indifferent to his statutory rights." *Boynton v. City of Tallahassee*, 650 F. App'x 654, 658 (11th Cir. 2016)(citations omitted). The Eleventh Circuit has held, to hold an entity liable under the RA, a plaintiff must allege deliberate indifference by "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [entity's] behalf [and who] has actual knowledge of discrimination in the [entity's] programs and fails adequately to respond." *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012).

With regard to actual knowledge, Plaintiff cannot allege that any official had actual knowledge of her disability prior to August 2020. Plaintiff herself did not know of her damaged discs until ICDC performed diagnostic testing in August 2020, and thus, Plaintiff could not have provided conclusive evidence of a disability to any facility official prior to that time.[12] Instead, medical personnel were only informed by their observations made during treatment and were required to engage in a normal diagnostic process. Prior to August 2020, the Complaint does not allege that Plaintiff informed medical personnel of any issue with sleeping, eating, or other basic

---

[12] The Complaint explains that imaging confirming damage to her spinal discs became available in August 2020. [Doc. 1 ¶ 56].

6

life activities, only that Plaintiff informed medical personnel that she had back pain.[13] Too, by her own measure, Plaintiff only went to the medical unit twice per month before an MRI scan was performed.[14] Such infrequency in her complaints does not allege behavior consistent with a severe disability. Despite Plaintiff's allegations that LaSalle ignored Plaintiff's alleged disability for six months, the Complaint only alleges that medical personnel had any reason to know of any limitation beginning, at the earliest, in August 2020.[15] Prior to that time, ICDC officials could not have known that Plaintiff's infrequent complaints of pain were consistent with a disability. Thus, only ICDC conduct after August 2020 could potentially be considered deliberately indifferent.

Moreover, outside of ordering accommodations, no person within ICDC had the authority to grant such a request. To that end, an "official" for RA purposes, "'is someone who enjoys substantial supervisory authority within an organization's chain of command so that, when dealing with the complainant, the official had complete discretion as a 'key decision point' in the administrative process.'" *Moura v. Bd. of Regents of Univ. Sys. of Georgia*, No. 1:18-CV-5534-AT, 2021 WL 4815895, at *7 (N.D. Ga. Mar. 5, 2021)(*quoting Liese*, 701 F.3d at 350).[16] As discussed *supra*, the Complaint alleges that ICE gets the final say on any determinations regarding denials of disability accommodations. [Doc. 1 ¶¶ 73-75]. Additionally, the Complaint alleges that ICE did, in fact, deny Plaintiff's requests. [Doc. 1 ¶¶ 54-56]. Accordingly, Plaintiff has not alleged

---

[13] *See, e.g.,* [Doc. 1 ¶ 49]. Also, in the sole allegation regarding access to meals, the Complaint does not allege when Plaintiff requested a wheelchair, whether medical personnel authorized the use of a wheelchair, or whether she made any request to be evaluated for use of a wheelchair. The Complaint simply alleges that "ICDC staff" prevented Plaintiff from using a wheelchair. [Doc. 1 ¶ 53]. Likewise, despite an allegation that she was unable to dress herself, Plaintiff does not allege that she informed medical personnel of this alleged limitation. [Doc. 1 ¶ 46].

[14] Plaintiff's Complaint states that she sought treatment for her back only twelve times over an eight month period—a rate of less than twice per month. Paragraph 49 of the Complaint sets out 12 occasions on which Plaintiff complained to medical staff about her back pain. Paragraphs 33-34 and 57 indicate that the pain began on April 21, 2020 and continued until Plaintiff's release on December 24, 2020.

[15] According to the Complaint, Plaintiff requested an accommodation for the first time on August 13, 2020 when she requested a thicker mattress. [Doc. 1 ¶ 50].

[16] While the *Moura* court points out that determining who qualifies as an "official" is a fact intensive process, here, a Motion to Dismiss is proper because Plaintiff's allegations on the face of the Complaint confirm that no ICDC personnel had the authority to override ICE's decisions regarding denials of accommodations. [Doc. 1 ¶¶ 73-75]

that any ICDC official had the authority to address any alleged discrimination because the Complaint admits that while ICDC ordered accommodations, ICE, not ICDC, denied Plaintiff's requests for accommodations. [Doc. 1 ¶ ¶ 54-56]. For these reasons, Plaintiff has failed to allege that LaSalle was deliberately indifferent to her rights and the claim should be dismissed.

> **B. This Court should utilize its discretion to determine that Plaintiff's claim against LaSalle should be dismissed because Plaintiff has not exhausted her administrative remedies.**

Despite her many arguments that exhaustion is not mandatory, Plaintiff does not dispute that this Court possesses the discretion to hold that Plaintiff's claims should be dismissed based on her failure to exhaust administrative remedies.[17] Instead, Plaintiff challenges whether the instant matter is ripe for a discretionary application of exhaustion of remedies and provides her own facts in an attempt to excuse her lack of exhaustion.

First, this matter is ripe for application of the exhaustion of remedies principle because LaSalle was denied any meaningful opportunity to correct the alleged errors. LaSalle's arguments have made clear that if Plaintiff had followed the grievance procedures, ICDC officials would have received an opportunity to evaluate Plaintiff's specific situation and advocate further with ICE on her behalf. The interest to LaSalle is that it would have been given the opportunity to correct issues before being haled into federal court.[18] In response, Plaintiff argues, "[a]s a for profit corporation [LaSalle] lacks both the competence and ability to grant relief." [Doc. 11 at 12]. Plaintiff cannot, on the one hand, allege that LaSalle was capable, but failed to provide accommodations, as she

---

[17] Plaintiff makes much of LaSalle's inclusion of extrinsic evidence in its initial Motion (despite adding the same to her Response), but LaSalle has only included evidence which would show that Plaintiff failed to exhaust her administrative remedies, to be utilized by the Court under the requisite two-step process set out by the Eleventh Circuit for such an inquiry in *Turner v. Burnside*, 541 F.3d 1077, 1082-83 (11th Cir. 2008). Accordingly, extrinsic evidence offered would only be relevant in the event that the Court reaches the second stage of the inquiry. Plaintiff does not dispute this Court's ability to undertake such an inquiry.

[18] Such concerns relating to private prisons also acknowledged by congress in the PLRA. *See, e.g., Pri-Har v. Corr. Corp. of Am.*, 154 F. App'x 886, 888 (11th Cir. 2005).

does with regard to the deliberate indifference criteria, while also claiming that LaSalle could not have provided the same accommodations as relief under its grievance procedures. That is, to the extent that Plaintiff claims that LaSalle could have and should have provided accommodations to prevent Plaintiff's injuries, it logically follows that LaSalle could have provided those same accommodations if Plaintiff had followed LaSalle's formal grievance procedures.

Plaintiff further claims that no functional remedy was available to her. Yet, Plaintiff's allegation that the handbook did not contain instructions on how to request disability accommodations is nonsense; the handbook provides that a formal grievance may be used for "medical issues." [Doc. 8, Ex. 2 at 11](emphasis added). Accordingly, Plaintiff need only to have filed a formal grievance discussing her requests for accommodations and the process would have been satisfied. Additionally, Warden Paulk's affidavit confirms that formal grievance forms are available in all dorms and by request from staff. [Doc 8, Ex. 1 ¶ ¶ 12]. Plaintiff's arguments that she did not understand English are equally unavailing. First, both the Handbook and the Formal Grievance Form were available in both English and Spanish.[19] Moreover, when Plaintiff received the Handbook, she acknowledged receipt and signed for acceptance of the handbook's procedures on a form where both English and Spanish versions of the acknowledgment were present. Plaintiff signed the English version.[20] Additionally, as the Complaint notes, Plaintiff submitted numerous requests for treatment—both in Spanish and in English. Thus, Plaintiff had both the ability to read and write in English.[21] Moreover, the medical notes attached to Plaintiff's Response to the instant Motion indicate that Plaintiff was granted an interpreter in most if not all of her visits to the medical unit—Plaintiff had no reason to believe that she could not request the use of an interpreter to make

---

[19] True and correct copies of the Spanish versions of the Handbook and Formal Grievance Forms are attached hereto as "Exhibit B" and "Exhibit C," respectively.
[20] A true and correct copy of the Acknowledgment Form is attached hereto as "Exhibit D."
[21] A true and correct copy of a selection of Plaintiff's requests for treatment are attached hereto as "Exhibit E".

9

requests or participate in the grievance process. Finally, even if Plaintiff was legitimately unaware of the handbook's procedures, as Plaintiff was represented by counsel, counsel would have known that such a grievance procedure exists in facilities like ICDC and should have advised Plaintiff to follow those procedures to seek relief.[22]

What is more, to the extent that Plaintiff claims she feared retaliation, such fear did not prevent her from visiting the medical unit or repeatedly requesting her medical records, which she explicitly noted were for her lawyer. *See*, Ex. 5. Likewise, Plaintiff's Complaint confirms that fear did not prevent her from repeatedly asked for assistance from Defendant White, the officer that she claims instigated the attack against her. Accordingly, based on the foregoing, none of the remedies cited in LaSalle's Motion to Dismiss were unavailable to Plaintiff. Instead, Plaintiff failed to execute ICDC's grievance requirements because she simply failed to take the requisite action. Accordingly, this Court should utilize its discretion to require an exhaustion of remedies, consistent with the requirements of the PLRA, and Plaintiff's claim under the RA against LaSalle should be dismissed.

### III. CONCLUSION

For these reasons, pursuant to Fed. R. Civ. P. 12(b)(6), Defendant LaSalle requests that this Motion to Dismiss be granted and that Plaintiff's claims against LaSalle be dismissed.

This, the 11th day of July, 2022.

Respectfully submitted,

**LASALLE SOUTHEAST, LLC**

By: ___*s/ John T. Rouse*___
    One of its Attorneys

---

[22] The Complaint states that Plaintiff was permitted to continue scheduled visits with her attorney, even while in confinement. [Doc. 1 ¶ 41].

OF COUNSEL:

John T. Rouse (GA Bar No. 868514)
McGLINCHEY STAFFORD, PLLC
1020 Highland Colony Parkway, Suite 702
Ridgeland, Mississippi  39157
Tel: (769) 524-2329 | Fax: (601) 608-7871
Email: jrouse@mcglinchey.com
*Counsel for Defendant LaSalle Southeast, LLC*

**CERTIFICATE OF SERVICE**

In accordance with the Middle District of Georgia's electronic filing procedures, I hereby certify that I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. A Notice of Electronic Filing will be sent by the Court to all counsel of record who have consented to email notification and electronic service. This document is available for viewing and downloading from the Court's ECF system. I hereby certify that if a party's counsel of record does not participate in Notice of Electronic Filing, I have served a copy on the party's counsel of record either by hand delivery, facsimile, electronic mail or placing same in the U.S. Mail, postage prepaid, on this 11th day of July, 2022.

*/s/John T. Rouse*
John T. Rouse